983 F.2d 1059
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Sheila M. WOODWARD, Plaintiff-Appellant,
v.
Louis W. SULLIVAN, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 91-2285.
 United States Court of Appeals,
Fourth Circuit.
 Argued: September 30, 1992
Decided: January 11, 1993
 
 Appeal from the United States District Court for the District of South Carolina, at Greenville. Joseph F. Anderson, Jr., District Judge. (CA-87-70-6-17-K)
 ARGUED: George Howard Thomason, Thomason & French, Spartanburg, South Carolina, for Appellant.
 Richard Hugh Fox, Office of the General Counsel, Social Security Division, Department of Health and Human Services, Baltimore, Maryland, for Appellee.
 ON BRIEF: Donald A. Gonya, Chief Counsel for Social Security, Randolph W. Gaines, Deputy Chief Counsel for Social Security, A. George Lowe, Deputy Associate General Counsel for Disability Litigation, Social Security Division, Department of Health and Human Services, Baltimore, Maryland; E. Bart Daniel, United States Attorney, James D. McCoy, III, Assistant United States Attorney, Greenville, South Carolina, for Appellee.
 D.S.C.
 Reversed and remanded.
 Before RUSSELL, HALL, and WILLIAMS, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 Sheila Woodward appeals an order of the district court, adopting the recommendation of a magistrate, affirming the denial of her claim for social security disability benefits. We reverse.
 
 I.
 A.Background
 
 2
 Woodward was born February 19, 1960, without a left forearm. She is a high school graduate of normal intelligence, above normal reading skills, and somewhat subpar math proficiency.
 
 
 3
 Between 1976 and 1981, Woodward held four different jobs-cashier at a drug store and a fast-food restaurant, waitress at another restaurant, and loom oiler at a textile mill. She had to leave each of these jobs for personal reasons.[1] She has not worked since January, 1981, and her disability insured status expired September 30, 1986.
 
 
 4
 Woodward married and had a child at nineteen; the marriage was not a happy one, and it ended in divorce. She later remarried and had another child. On a typical day, she readies her children for school in the morning, cleans her house, prepares the family's supper, washes the dishes with help from her daughter, and puts the children to bed. She spends most of her time at home, though she does accompany her husband on grocery-buying trips.
 
 B.Physical Impairments
 
 5
 Woodward's most serious physical limitation is, of course, the absence of her forearm. However, in 1979, Woodward was injured in an automobile accident. Though her fractured pelvis healed, she now suffers from some disc degeneration in her lower back, crepitus (a cracking sound) in her knees, and chondromalacia (cartilage softening) of the patellas. These conditions produce pain, for which Woodward takes mild painkillers.
 
 
 6
 Dr. Griz, Woodward's treating physician, examined her in 1988 for a vocational rehabilitation evaluation.[2] He found that Woodward had "good" use of her right arm, a normal neck and upper back, and "good extension, lateral bend and rotation of her back." She had slight lordosis (anterior concavity in the curvature of the back). Straight leg raising, gait, and hip and knee motion were all normal. Dr. Griz did note crepitus, chondromalacia and early degenerative disc disease of the lower back. Dr. Griz found that Woodward was "moderately restricted" from long standing and sitting, heavy lifting, and bending. He believed that she could frequently lift ten pounds and occasionally twenty. During an eight-hour day, claimant could stand three to four hours and sit three to four hours. Occasionally, she could climb, stoop, kneel, balance, crouch, and crawl. In his ultimate conclusion, however, Dr. Griz felt that Woodward was a "poor candidate" for work because she was depressed and withdrawn.
 
 C.Psychological Impairments
 
 7
 As Dr. Griz noticed, Woodward suffers from depression, which, she contends, exacerbates her disability. There are reports from four psychological examinations in the record.
 
 
 8
 On February 19, 1981, very soon after she last worked, Woodward was examined by Gary Jones, a psychologist. According to Jones' report, Woodward was "extremely frustrated" because she could not find an adequately paying job. She stated that she had toured a plant where her parents worked and saw several jobs she knew she could do. "Emotionally, Sheila indicated that she is basically doing all right. She stated that her main problems are financial because of a lack of employment." She reported no physical problems other than her missing arm. Jones thought that Woodward was an excellent candidate for vocational training, and that she had strong desire and motivation for work.
 
 
 9
 Nearly five years later, on December 11, 1985, Woodward was examined by Dr. Martha Westrope. Dr. Westrope found severe emotional problems-"hypersensitiveness, suspiciousness, depression, and probable paranoid panics." Because Woodward"stay[ed] to herself," she had "no corrective influences taking place in her life." Dr. Westrope was notably pessimistic about Woodward's ability to handle stressful situations, specifically in dealing with co-workers or supervisors in a work setting.
 
 
 10
 Dr. Luther Diehl examined Woodward on August 26, 1986. He found her to be a "very depressed, rather sullen young woman." In his discussion of Woodward's residual capacity, Diehl rated her individual vocational capacities as at least "fair," with one exception-ability to respond to "customary work pressures"-which he rated as "fair to poor." In his conclusions, however, Diehl stated that "[w]ithout significant educational improvement, potential for gainful employment would be considered very poor."
 
 
 11
 Finally, Dr. Henry Ritchie examined claimant on March 10, 1988. He, too, found Woodward depressed, and "moderately severely impaired related to people." He noted that she had not been treated for her depression, and he felt that treatment could be beneficial and rehabilitative. Dr. Ritchie did not agree with Dr. Westrope's findings that Woodward suffers from paranoid panic and ideation. His opinion on her prognosis was "guarded." Though he found that Woodward's depression was "limiting to her at this particular point in time," he believed that the depression would not prevent her from working because it "did not in the past." Ritchie concluded,
 
 
 12
 I think a good deal of her depression is secondary to a poor financial situation and the "Catch 22" situation she finds herself in in that she cannot afford to work in the jobs that will hire her. If a major industry would take her under [its] wing she probably would be rehabilitated and less depressed.
 
 II.
 
 13
 Woodward filed this claim for disability benefits on May 17, 1985, though she alleged disability beginning in January, 1981. After her claim was denied initially and on reconsideration, Woodward requested a hearing before an administrative law judge (ALJ). A hearing was held on March 18, 1986, at which the claimant, her mother, and a vocational expert (VE) testified. Medical reports were also introduced. On June 6, 1986, the ALJ issued a decision denying benefits. The Appeals Council affirmed.
 
 
 14
 On January 12, 1987, Woodward filed suit in district court to challenge the Secretary's final decision. On December 3, 1987, the magistrate remanded the case with instructions to obtain and consider additional evidence. On August 24, 1988, without holding a supplemental hearing, the ALJ issued a second decision finding Woodward not disabled. On Woodward's request for review, the Appeals Council, without agreeing or disagreeing with the ALJ's decision, remanded for a supplemental hearing. After this hearing, held March 10, 1989, the ALJ decided for a third time that Woodward was not disabled. The ALJ concluded that Woodward could return to her past relevant work as a cashier. On June 30, 1990, the Appeals Council affirmed the denial of benefits, though it modified the ALJ's decision to show that Woodward could perform work available in the national economy, but could not return to her past relevant cashier work, because that particular job required standing throughout the workday. In making this finding, the Appeals Council relied on the testimony of the vocational expert at the 1986 hearing.
 
 
 15
 Woodward returned to district court. The magistrate concluded that substantial evidence supported the Secretary's decision. Accordingly, he recommended that the denial be upheld. Woodward filed timely objections to the magistrate's report. The district court conducted a de novo review and agreed with the magistrate.
 
 
 16
 Woodward appeals.
 
 III.
 
 17
 The factual findings of the Secretary must be affirmed if supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971). In this case, the denial rests on the final inquiry of the five-part sequence for evaluating disability claims[3]-whether the claimant retains the residual functional capacity to perform jobs available in significant numbers in the economy. In this final inquiry, a prima facie case of disability has been established, and the burden of rebutting it with proof of the claimant's residual capacity and the availability of suitable jobs is on the Secretary.
 
 
 18
 Our inquiry is narrowed by Woodward's focus on the psychological evidence. As we understand her argument, she does not contend that there is not substantial evidence to support a finding that her physical limitations, standing alone, do not render her totally disabled. Instead, she asserts that her physical deficits necessarily limit her to a small range of occupations, and that her emotional problems in turn preclude these.
 
 
 19
 The Secretary emphasizes that much of the psychological evidence supports a finding that Woodward's depression is a result, rather than a cause, of her unemployment. Perhaps it could, but the Secretary's dichotomy is too rigid. Woodward's depression may indeed have begun as a reaction to lack of work and the attendant financial difficulties. Nonetheless, if her depression progressed to the point of precluding employment before her insured status expired, she was "under a disability" and is entitled to benefits. The genesis of her inability to work is irrelevant, even if it was frustration at the lack of work.
 
 
 20
 Dr. Ritchie's 1988 report is the centerpiece of the Secretary's case. Even Dr. Ritchie, though, conceded that Woodward was"limited" by her depression. His opinion that her depression would not interfere with her working rests on his assumption that the severity of Woodward's symptoms was the same while she was working (prior to 1981) as it was at the time of his evaluation (in 1988). Dr. Ritchie of course did not examine Woodward in 1981 or earlier. Moreover, in light of his opinion that a "good deal" of Woodward's depression was related to her failure to find a job, the severity of this depression should have been worse after prolonged unemployment than before it.
 
 
 21
 Furthermore, though Dr. Ritchie opined that Woodward might be able to work if a "major industry" would protect her under its "wing," there is no basis in the record to support the conclusion that the jobs identified by the Appeals Council-cashier who is permitted to sit, interviewer, and information clerk-were in"major industries" with the willingness and wherewithal to spread wings over the emotionally distressed. This evidentiary hole is explained by the Secretary's decision not to offer new VE testimony after the first remand. Hence, the VE testimony at the 1986 hearing must bear the Secretary's burden.
 
 
 22
 At the 1986 hearing, two hypothetical questions were asked of the VE-one by the ALJ and the other by Woodward's attorney. The physical limitations described by each question did not differ materially, but the emotional impairments were quite differently stated. The ALJ asked the VE to assume that Woodward has
 
 
 23
 some depression and an adjustment disorder associated with her unemployed status and financial status and domestic situation.
 
 
 24
 In response to the ALJ's hypothetical, the VE opined that a person so described could be a cashier if permitted to sit, an interviewer, or an information clerk. Later, Woodward's attorney included the many limitations described by Dr. Westrope:
 
 
 25
 [H]er mental impairment of depression prevents her from dealing appropriately with the public ... Consider that she becomes rattled under pressure.... She has crying spells ... one time a week.... [S]he is moderately severely limited in responding to supervision[, m]oderately severely to severely limited in responding to co-workers[, and m]oderately severely to severely limited to responding to customary work pressures.
 
 
 26
 In response to this question, the expert stated that a person with such limitations could not perform work available in the national economy.
 
 
 27
 In the first round of litigation in the district court, the magistrate concluded that the ALJ's rejection of Dr. Westrope's findings in favor of a conclusion that Woodward's emotional impairments were mild lacked substantial evidence. After reminding the ALJ that she cannot exercise expertise she does not possess, see Wilson v. Heckler, 743 F.2d 218 (4th Cir. 1984), the magistrate reasoned:
 
 
 28
 The plaintiff was psychologically evaluated on three different occasions. The ALJ does not support her dismissal of Dr. Westrope's report with any conflicting data from Dr. Diehl's or Mr. Jones' reports, nor does she establish any inconsistencies between these reports and Dr. Westrope's. In fact, all of the psychological reports are supportive of the others. As early as 1981, the plaintiff was diagnosed by Mr. Jones as having an adjustment disorder with mixed emotional features. All of the examiners found the plaintiff to be functioning within the average range of intelligence and both Dr. Westrope and Dr. Diehl found the plaintiff to suffer severe depression with crying spells [citations to administrative record omitted]. The administrative law judge specifically attacks Dr. Westrope's findings on the plaintiff's residual functional capacity as having no support in the medical record. However, she fails to note that Dr. Westrope is the only psychologist in the record who completed the supplemental questionnaire. Also, the ALJ cannot attempt to discredit Dr. Westrope's conclusions because there is no psychological testimony in evidence; the presence or absence of such data has no relevance to the viability of Dr. Westrope's evaluation. If the administrative law judge felt this evidence was required to make an adequate decision, she should have obtained it. The ALJ's summary dismissal of Dr. Westrope's report was not supported by substantial evidence.
 
 
 29
 On remand, the ALJ did obtain the report of Dr. Ritchie, who did not believe that Woodward suffered from some of the more severe conditions found by Dr. Westrope. However, we believe that Dr. Ritchie's report cannot carry the Secretary's burden. As we noted above, Dr. Ritchie found Woodward's depression to be primarily a result of her unemployment and concomitant financial problems, yet he incongruously assumed that her depression had been just as severe when she was working prior to 1981. Moreover, Dr. Ritchie qualified his "guarded" prognosis with his vocational opinion that some magnanimous employer might take Woodward under its "wing" and rehabilitate her. Because the Secretary did not introduce testimony from a vocational expert to find out whether the extremely limited classes of jobs to which Woodward is physically suited includes employers with such wings, and it is the Secretary's burden to supply such testimony, the denial of benefits again lacks substantial evidence.
 
 
 30
 The judgment is reversed, and the claim is remanded with instructions to remand to the Secretary for an award of benefits.
 
 REVERSED AND REMANDED
 
 
 [1]
 In particular, she quit the loom oiler job because of domestic problems, her drug store position because of her first pregnancy, and her waitressing because the low pay did not offset the cost of a babysitter. Her fast-food restaurant job was part-time employment while she attended high school
 
 
 [2]
 There are other physical examinations in the record, but they are not materially different in findings
 
 
 [3]
 See 20 C.F.R. § 404.1520